UNITED STATES of America

v.

**Kenneth BOWEN, Robert Gisevius, Robert Faulcon, Anthony Villavaso, Arthur Kaufman, Gerard Dugue.**

**Criminal Action No. 10–204.**

United States District Court, E.D. Louisiana.

Nov. 26, 2012.

Barbara Bernstein, Christopher Lomax, Cindy K. Chung, Thomas E. Perez, U.S. Department of Justice, Washington, DC, Theodore R. Carter, III, U.S. Attorney's Office, New Orleans, LA, for United States of America.

Rachel I. Conner, Rachel I. Conner, Attorney at Law, Virginia Laughlin Schlueter, Federal Public Defender, New Orleans, LA, Robin Elise Schulberg, Robin Elise Schulberg, Attorney at Law, Covington, LA, for Kenneth Bowen.

Christopher Albert Aberle, Christopher A. Aberle, Attorney at Law, Mandeville, LA, for Robert Gisevius.

Lindsay A. Larson, III, King, Krebs & Jurgens, PLLC, New Orleans, LA, for Robert Faulcon.

Roger W. Kitchens, DeSalvo, Blackburn & Kitchens, Timothy Allison Meche, Timothy A. Meche, Attorney at Law, New Orleans, LA, for Anthony Villavaso.

Stephen David London, Stephen D. London, Attorney at Law, Ian Lewis Atkinson, William P. Gibbens, Schonekas, Evans, McGoey & McEachin, LLC, New Orleans, LA, for Arthur Kaufman.

Claude John Kelly, III, Claude J. Kelly, Attorney at Law, Michael W. Hill, Law Offices of Michael W. Hill, LLC, New Orleans, LA, for Gerard Dugue.

## *ORDER AND REASONS*

KURT D. ENGELHARDT, District Judge.

Before the Court is the Motion for New Trial (Rec. Doc. 963) urged originally by defendant Arthur Kaufman, and joined in by the other defendants in this matter.[1] The motion is opposed by the government (Rec. Doc. 1007).

## *PART I*

### I. Underlying Facts

After a multi-week jury trial, Defendants Bowen, Gisevius, Faulcon, Villavaso, and Kaufman, all former officers of the New Orleans Police Department (NOPD), were found guilty on August 5, 2011, of multiple counts of a 25–count redacted indictment.[2] The charged crimes arose from police activity following Hurricane Katrina, specifically shootings on or around the Danziger Bridge in New Orleans, and subsequent attempts to falsify reports and/or

---

1. Defendant Gerard Dugue did not go to trial with the other defendants, and is not a movant here.

2. The Redacted Indictment is Rec. Doc. 566–1.

make false statements to authorities in order to cover up what had happened on the morning of September 4, 2005.

Bowen was found guilty of Counts 1, 2, 3, 4, 5, 6, 7, 10, 11, 12, 13, 19, and 20; Gisevius was found guilty of Counts 1, 2, 3, 4, 5, 6, 7, 11, 12, 13 and 21; Faulcon was found guilty of Counts 1, 2, 3, 4, 5, 6, 7, 8, 9, 11, 12 and 22; Villavaso was found guilty of Counts 1, 2, 3, 4, 5, 6, 7, 11, 12 and 23; and Kaufman was found guilty of Counts 11, 12, 13, 14, 15, 16, 17, 18, 24, and 25.

Certain Defendants sought post-trial relief on various counts, and some convictions were vacated as follows: Defendant Bowen was granted relief, pursuant to Rules 29 and alternatively 33, as to Count 10; Defendants Bowen, Gisevius, Faulcon and Villavaso as to Count 12; and Defendants Bowen and Gisevius as to Count 13.

## II. The Subject Motion For New Trial [3]

In the subject motion for new trial, Defendants argue that the government:

> engaged in a secret public relations campaign against defendant Kaufman and his codefendants. As a result of these efforts, the government ensured that "Danziger" would become the household name for corruption in the New Orleans Police Department, that public opinion would be inflamed against the defendants, and that the government's version of the facts would be well known before anyone set foot in a courtroom.

(Rec. Doc. 963, p. 1, ¶ 1). Defendants additionally contend that various unidentified "law enforcement sources" and "sources close to the investigation" improperly disclosed to the media the government's theories regarding Defendants' alleged guilt, including activities of the federal grand jury, the identities of targets, the status of plea negotiations, and other sensitive confidential information that became widely known publicly before trial. Defendants further allege that, in addition to these activities, former Assistant United States Attorney ("AUSA") Senior Litigation Counsel Salvador Perricone, then a high-ranking supervisory attorney in the Eastern District of Louisiana (EDLA), surreptitiously posted opinions and criticisms online on the public web page "nola.com", which is affiliated with the New Orleans *Times Picayune* newspaper, to undermine the trial itself by making comments, both before and during the trial, that mocked the defense, attacked the defendants and their attorneys, were approbatory of the United States Department of Justice ("DOJ"), declared the defendants obviously guilty, and discussed the jury's deliberations.[4] Asserting that the government's efforts to impact Defendants' right to a fair trial is "shocking and unprecedented" (Rec. Doc. 963, p. 2, ¶ 4), Defendants offer several illustrations of such conduct in their memorandum, focusing in part on the rearraignment and plea bargain of former NOPD Lieutenant Michael Lohman, a key cooperating witness

---

**3.** Defendant Kenneth Bowen has filed a separate motion for new trial (Rec. Doc. 906) premised upon the discovery of new evidence previously withheld by the government, to-wit: a video tape of the Danziger Bridge shortly after the shooting. The other defendants joined in. That motion, however, is not the subject of this Order and Reasons.

**4.** The allegations that former AUSA Perricone posted such comments in the public forum

offered on nola.com were originally set forth in a petition filed in Civil District Court for the Parish of Orleans, State of Louisiana, Docket No. 12–2509, filed on March 12, 2012. On March 15, 2012, U.S. Attorney Jim Letten announced that Perricone, after being unmasked, had admitted he posted publicly as "HenryL.Mencken1951." Perricone resigned on March 20, 2012.

who testified at trial. Lohman's rearraignment occurred on February 24, 2010, before United States District Judge Ivan Lemelle, who even then expressed concern over the fact that Lohman's impending plea had already been reported in the news media the day before the hearing, despite the entry of a court-ordered seal of the record on February 5, 2010. *United States v. Michael Lohman*, USDC–EDLA No. 10–32 "B" (Rec. Doc. 5). The premature report also raised concerns pursuant to Rule 6(e) of the Federal Rules of Criminal Procedure regarding grand jury secrecy. The specific postings referenced by Defendants and other grounds for relief sought are set forth in Kaufman's memorandum submitted in support of his motion for new trial. (Rec. Doc. 963–1). Defendants seek an evidentiary hearing to establish the basis for their assertions. *Id.*

In response, the government denies any wrongdoing by its personnel, and asserts that Defendants' claims are not "backed by any evidence." (Rec. Doc. 1007, p. 14). Apparently attempting to mitigate what obviously was a breach of then-Magistrate Judge Louis Moore and Judge Lemelle's court orders, the government further asserts that, in any event, Lohman's plea would eventually become known publicly, and therefore refers to the violation of the seal as "a one day leak." *Id.* at p. 17. Insofar as Senior Litigation Counsel

AUSA Perricone's misconduct is concerned, the government simply states that that matter has "been referred to the Department of Justice Office of Professional Responsibility for review", and asserts that "the possibility that Perricone might have violated his employer's ethics rules [does not] have any effect on the Danziger Bridge matter." *Id.* at p. 20.

## III. The June 13, 2012 Hearing and Submissions

### A. The Hearing

On June 13, 2012, the Court held a hearing, consisting of oral argument, regarding Defendants' motion.[5] At the hearing, the Court expressed serious concerns regarding any violation of Rule 6 generally, and/or the sealing orders in the *Lohman* matter. (June 13, 2012 Transcript, pp. 33–37, 42–45). Following argument by DOJ prosecutor Barbara Bernstein[6], United States Attorney Jim Letten[7] addressed the Court:

First of all, Your Honor is absolutely correct in wanting, I think, to focus institutionally in some way in order to get a response from someone in authority, and that's me as the United States Attorney for the Eastern District of Louisiana, as to whether or not we, the government, authorized, procured, aided, produced or made any leaks of any pro-

---

5. At the hearing, Defendants seemed to concede that the gravamen of their motion was not that the trial jury itself was contaminated despite the voir dire process and the Court's instructions during the trial. (June 13, 2012 Transcript, p. 10). Rather, Defendants argue that the government's leaking and unauthorized writings of AUSA Perricone, as well as other actions by the government prior to trial, created a prejudicial environment amongst the public, which convinced certain witnesses to enter lenient guilty pleas, agree to cooperate, and provide false testimony favorable to the government's theory of the case to avoid the then-perceived prosecutorial juggernaut

depicted in the media (and based on the government's conduct). Defendants also contend that Perricone's postings during the trial impacted witness testimony.

6. Deputy Chief, Criminal Section, U.S. DOJ Civil Rights Division, and lead prosecutor in this case.

7. Unless otherwise stated, references herein to "United States Attorney" or "United States Attorney's Office" refer to the United States Attorney for the Eastern District of Louisiana.

tected information whatsoever. (June 13, 2012 Transcript, p. 37, l. 21–p. 38, l. 4).

Letten also addressed the *Lohman* matter and denied that the government was the source of any leak regarding the *Lohman* plea. *Id.* at pp. 38–39. Lastly, he spoke regarding the Perricone matter:

> In terms of Perricone, Judge, I will tell you right now on the record that I didn't—I've said this publically before, neither I, nor Jan Mann, nor people in positions in authority in our office, to my knowledge did not have any knowledge of, nor did we authorize, nor did we procure or have any knowledge of Sal Perricone anonymously posting comments about cases or anything like that whatsoever until we learned about it in the filing. That is gospel truth. (*Id.* at p. 40, l. 7–14).

First Assistant United States Attorney Jan Mann was present and seated at counsel's table with U.S. Attorney Jim Letten.

At the conclusion of the hearing, the Court ordered the government to compile and produce a report, within 14 days, indicating all steps that it had taken, to date, to investigate and discern the source of the leaks that were referred to at the June 13th hearing. (June 13, 2012 Transcript, p. 44, l. 2–p. 45, l. 24; June 13, 2012 Minute Entry, Rec. Doc. 1020). The Court instructed that these efforts should be "significant steps", and further stated:

> I would like that report to be categorical. It need not be lengthy but I would like to know event by event what was done to discern the source of the leaks that are referred to in these documents.[8] It should also include government personnel, including, but not limited to, Mr. Perricone and his contact with others in

terms of this subject matter. It should be categorical in its denial. (*Id.* at p. 44, l. 19–p. 45, l. 11).

Considering the defendants' request for an evidentiary hearing, and the Court's desire to avoid what could well become a mere futile scavenger hunt, the Court ordered Defendants to submit a specific description and plan for the evidentiary hearing sought, including then-anticipated witness testimony, and what Defendants and the Court could expect to learn from the hearing. (June 13, 2012 Transcript, pp. 46–47). The Court emphasized that Defendants indeed had "a tough road to hoe" before being granted an evidentiary hearing, and "a much tougher, steeper road to hoe before we get to any Rule 33 relief." (*Id.* at p. 46).

In so ruling, the Court figured it could then evaluate the government's efforts at truly preserving the integrity of the prosecutorial process (with regard to both the issue of Rule 6 and "leaks" as well as Perricone's improper behavior as AUSA), in light of the serious allegations raised by Defendants; and determine whether Defendants had any serious basis for believing that any concerted prosecutorial misconduct had occurred, and further whether it impacted the investigation and prosecution in this matter.

### B. The Post–Hearing Submissions of the Parties

#### 1. The Government

Both the government and Defendants timely submitted the requested materials, *ex parte*, for *in camera* review. The government's June 27, 2012 "Report of Inquiry" was supervised, compiled, written and submitted by First AUSA Jan Mann. Only her name is on the Report, and it came

---

**8.** The "documents" referred to here are emails ordered by the Court for *in camera* inspection before the June 13, 2012 hearing that relate to the Lohman plea "leak."

under cover letter signed only by her. In the Report, she denies that anyone associated with the government caused a "leak" [9], and concluded that any sensitive information which was published came from "non-government sources" and not prosecution or investigatory agents. Curiously enough, despite the Court's instructions, First AUSA Mann's Report makes little mention of Senior Litigation Counsel AUSA Perricone. In fact, the only information provided about Perricone (on page 9) was that which was the result of a one-on-one interview of him by Mann herself, who states that "the information provided by Perricone on this point was consistent with my own knowledge that Perricone—who is neither a member of the trial team nor a direct supervisor on the case—had never been provided with information about the sealed [Lohman] plea."

Additionally, except for exonerating the government as being the source of any "leak" of grand jury information, or violation of the seal in the *Lohman* matter, the government's submission identifies no effort taken to discern who *was* the source.[10] Indeed, the government's submission does not indicate any attempt whatsoever to contact the reporters who obtained such information, who would obviously be able to disclose whether such information truly came from a "non-government source" or someone associated with the government. *See, e.g., New York Times Co. v. Jascalevich,* 439 U.S. 1301, 1302, 98 S.Ct. 3058, 3059–60, 58 L.Ed.2d 9 (1978); *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); and *United States v. Smith,* 135 F.3d 963, 968–972 (5th Cir. 1998), discussing lack of privilege over reporter's confidential source's identity in a criminal case. Thus, the government's report is inconclusive.

## 2. The Defendants

For their part, Defendants' June 27, 2012 submission, which was submitted *ex parte* by counsel for Kaufman and not shown to other counsel or the other defendants,[11] describes the evidentiary hearing they seek, including the names of possible witnesses, and reasons for believing that testimony will be as described, including certain email collaboration. However, the undersigned was unwilling to schedule an evidentiary hearing, even in light of this submission, until further facts could be fleshed out to confirm certain suspicions and assumptions that Defendants make but cannot yet support.

## IV. Further Orders From The Court

On July 9, 2012, in an attempt to determine whether Defendants' assumptions

9. United States Attorney Jim Letten referred to the published information as "leaks" in emails sent on Friday, February 19, 2010 ("... the leaks have started."), ("who the hell is leaking this if not Lohman himself?"). (*See* attachments to government's 6/12/12 submission.) DOJ lead prosecutor Barbara Bernstein also referred to a "leak" in an email to Letten and First AUSA Mann dated March 8, 2010. The word "leak" is also contained in an email from FBI Agent William Bezak, dated March 8, 2010, in reference to an AP Report. *Id.* Use of the term is without qualification on these occasions.

10. At the June 13, 2012 hearing, in First AUSA Mann's Report, and subsequently up to this day, the government has, as a knee-jerk reaction, speculatively (but without evidentiary support) blamed "nongovernmental sources", including defense attorneys, cooperating defendants, NOPD officers, NOPD rank, and local police fraternal unions and organizations.

11. The *ex parte* submission from Defendant Kaufman's counsel, dated June 27, 2012, and submitted for *in camera* review, pursuant to the Court's June 13, 2012 directive (Rec. Doc. 1020), indicates that, "due to the sensitive information involved," Kaufman "has not shared [his] proffer with other [defense] counsel, except in general terms and without identifying witnesses."

were made of whole cloth or, instead, could be confirmed to some extent or another, the Court ordered the following production by the government:

Any and all written communications via email or other means, from the United States Attorney for the Eastern District of Louisiana (or any assistant/subordinate or supervisor/superior of the United States Attorney for the Eastern District of Louisiana), whether strictly internal or not, discussing, directing, instructing, inquiring about, concerning, prohibiting, admonishing, or cautioning any or all employees of the United States Attorney's Office for the Eastern District of Louisiana or related personnel against posting comments or other verbiage on online web pages or sites including, but not limited to, that known as "nola.com", between the dates of February 17, 2010 and March 24, 2012;

IT IS FURTHER ORDERED that, in the event no such written communications or emails are found or do not exist, the United States Attorney for the Eastern District of Louisiana shall deliver to the chambers of the undersigned a sworn statement indicating that a due and diligent search has been conducted for such email(s), and that each and every employee of the United States Attorney's Office for the Eastern District of Louisiana has been provided a copy of this Order such that the opportunity for a due and diligent search might be conducted by each such employee.

(Sealed Rec. Doc. 1034). The government, again through First AUSA Mann, complied with this Order on July 13 and 20, 2012, by producing two binders of material, including some information outside the scope of time set forth in the July 9, 2012 Order. On August 1, 2012, following detailed review of that material, the undersigned, through his law clerk, further sought a catalog of AUSA Perricone's posts,[12] which was compiled by the government as part of its investigation (and therefore is work product), and queried whether former AUSA Perricone had ever answered questions under oath, from anyone, regarding his involvement in the improper dissemination of information or the posting of inflammatory comments/opinions/comments on nola.com. On August 8, 2012, First AUSA Mann responded, via email, that, to the best of her knowledge, former AUSA Perricone had not been questioned under oath; however, she also pointed out that the investigation was being conducted by other persons in the DOJ's Office of Professional Responsibility ("OPR"), and that the United States Attorney's Office was, by design, not involved in such inquiry.

## V. The Interview—Perricone Speaks Publicly: "This was my secret."

While the Court was reviewing the subject email documents from the government, and inquiring whether Perricone had been questioned under oath, another unexpected and intervening event occurred: Perricone chose to submit to an extensive interview with a writer for *New Orleans Magazine*. The resulting article ("Sal Perricone's Next Chapter") appeared in the August issue, which hit mailboxes and newsstands in or around the first week of August. The contents of that article, including his quotations, were later covered

---

12. The catalog was provided to the Court on August 7, 2012, by First AUSA Mann at the Court's request. Although it includes posts by "HenryL.Mencken1951", it does not include any mention whatsoever of other monikers, handles or alter egos that Perricone used, or may have used, in the past. No mention is made of "legacyusa", "dramatis personae", or "campstblue."

by the *Times Picayune* in its Tuesday, August 7, 2012 issue. The article states as follows:

> Perricone said his "motive" for the interview was to "clear Jim Letten" and the 120 other "dedicated, hard-working" employees of the U.S. Attorney's Office of any responsibility for his Internet acts, apologize to those he offended and to refute some media criticisms.

> \* \* \*

Contradicting widespread rumors to the contrary, Perricone insisted that no one in the U.S. Attorney's Office knew that he anonymously posted comments on *nola.com* as "HenryL.Mencken1951"—until he told Letten himself on March 13.

> "Jim Letten had no idea of what I was doing," Perricone said. "(First Assistant U.S. Attorney) *Jan Mann had no idea what I was doing. This is on me. I take 100 percent of the responsibility.*" (emphasis added.)

He stated: "This was my secret." In the article, Perricone also confirmed, for the very first time, more of that "secret", in that he had, in fact, used two other online handles: "legacyusa" [13], who made his debut in August 2009 and was last used for commenting in July 2011 (while trial in this matter was taking place), and "dramatis personae", which appeared for a few weeks thereafter, until Perricone began using "HenryL.Mencken1951." Perricone additionally stated, despite suspicions to the contrary, that he did not remember using the handle "campstblue," or any other names, though he did not deny as much. Finally, in the article, Perricone (through his counsel) indicated that he "would cooperate with any investigation." Indeed, Perricone himself stressed, "I *want* to be investigated because I want to get this *cleared.*" (italics as in the original article.) So be it.

## VI. The Court's Order Regarding The Emails

Having carefully reviewed the parties' *ex parte* submissions, the undersigned surmised that some of the emails produced by the government either support assertions made by the defendants in their June 27, 2012 *ex parte* submission, or may possibly relate to the broader allegations of the government's awareness and treatment of sensitive and unusually insightful nola.com posts. Thus, on Monday, August 13, 2012, the Court issued an Order (Sealed Rec. Doc. 1041) identifying 22 email communications (or groups of communications) that it believes relate, or could possibly relate, to issues raised by Defendants in their request for an evidentiary hearing, and ordering their production under seal by the end of the week. The Order also permitted the government an opportunity to object to that production. In ordering the production of these documents, which would and do still remain under seal, the Court also concluded that some limited discovery might be appropriate to provide additional facts needed to rule on the subject motion for new trial. Specifically, the limited discovery contemplated by the Court included taking the sworn testimony of former AUSA Perricone, and possibly others, such to obviate the need for a full-blown evidentiary hearing.

---

**13.** In his April 13, 2011 posting, only approximately two months before trial in this case began, Perricone, as "legacyusa", following the convictions in the well-publicized *"Robair"* case involving NOPD officer misconduct, *United States v. Williams*, No. 10–213, urged readers: "I'm glad the feds are here. We should all be glad. **Thin out the bad cops and replace them with good ones.** This is a sad day and a good day. **It's a beginning, not an end.**" (emphasis added.)

On August 15, 2012, the government, in a pleading signed by First AUSA Mann, objected to the production of the aforementioned email documents on the following grounds: (1) deliberative process privilege; (2) privacy of communications; (3) failure to comply with the *Touhy* regulations;[14] and (4) relevance. (Sealed Rec. Doc. 1045). In the alternative, the government also requested the issuance of a protective order in the event these documents are disclosed to defense counsel. *Id.* On August 17, 2012, Defendants filed an opposition to the government's position. (Sealed Rec. Doc. 1054).

The Court then reviewed each of the 22 documents listed in its August 13, 2012 Order in light of the government's objections, considering each one individually and independently in order to assess the validity of each objection, and to reconsider whether each such document should be provided to defense counsel. The government's objections to the production of the documents listed in this Court's Order of August 13, 2012 were sustained only as to Document No. 19, but overruled in all other respects. (Sealed Rec. Doc. 1055). The Court ordered the government to produce to defense counsel all documents listed in this Court's August 13, 2012 Order, except for Document No. 19, by noon on Friday, September 7, 2012, under the provisions of a strict protective order set forth in the Order. (*Id.* at pp. 21–22).

14. *United States ex rel. Touhy v. Ragen,* 340 U.S. 462, 71 S.Ct. 416, 95 L.Ed. 417 (1951); 28 C.F.R. §§ 16.21–16.28.

15. Both Bernstein and Carter are on the prosecution trial team.

16. The transcript of Perricone's testimony, except as set forth herein, is sealed.

17. On a few occasions, Perricone asserted his distrust of nola.com (October 10, 2012 Transcript, p. 7, l. 20; p. 33, l. 2; p. 42, l. 10), disavowing certain comments that might

The Court further ordered that a status conference be held on October 10, 2012, at which time former AUSA Perricone was ordered to be in attendance. (*Id.* at p. 22).

## VII. The October 10, 2012 Status Conference—Former AUSA Perricone, and a Follow–Up Exchange of Letters with First AUSA Mann

On October 10, 2012, the Court held the status conference as scheduled. Perricone and his counsel were in attendance, as were prosecutors Barbara Bernstein and Theodore Carter[15] on behalf of the government, defense counsel, and a court reporter. Also present on behalf of the U.S. Attorney's Office was First AUSA Mann, who occasionally objected on the record to certain questions asked of Perricone. The undersigned administered the oath to Perricone and he submitted to questioning by counsel.[16]

Former AUSA Perricone again admitted having used the online handles "dramatis personae" and "legacyusa", and further admitted using the name "campstblue." He qualified his involvement in posts by "campstblue", indicating he did not remember posting certain comments under that name, asserting that perhaps other persons were posting under "campstreetblue" and "campstblu." He then stated he did not recall which one of these variations he used. (October 10, 2012 Transcript, p. 7, l. 15–16).[17] Perricone further testified

seem attributable to one of his online personas, and further claiming that "Now, I know they (nola.com) have the ability to track people down. I know they have the ability to take down comments. I know they have the ability to put up comments. And that's why I'm hesitant to say which ones I wrote, unless I see and I remember them." (*Id.* at p. 7, l. 22–25–p. 8, l. 1). In this regard, Perricone was asked: "Q. Do you believe nola.com attributed comments to your screen names that you did not make? A. As I sit here today, I believe so." (*Id.* at p. 11, l. 17–19).

that he knew it was improper for him to post on nola.com as an Assistant United States Attorney, particularly Senior Litigation Counsel. (*Id.* at p. 18, l. 21–25). He maintained, however, that he was posting as a "private citizen." Perricone denied using any other fictitious names or assumed personas on nola.com, including "eweman." He was specifically asked whether he knew who "eweman" was, and responded with a simple "no." [18] Perricone stated under oath:

> Q. Before you told Jim Letten—and was it—do you remember the date? Was it March 15th?
>
> A. No. It was March 12th.
>
> Q. March 12th. Before you told Jim Letten that you were "Henry Mencken," had you told anybody in the U.S. Attorney's Office that you were commenting online?
>
> A. No. This is my little—as the newspapers called it, my little secret.
>
> Q. Had you told anybody outside the U.S. Attorney's Office that you were doing it?
>
> A. No, no.

Q. Had you ever discussed any of your comments with anybody inside or outside of the U.S. Attorney's Office? Not saying that you did them, but did you ever discuss the comments?

A. No, sir.

(*Id.* at p. 23, l. 12–p. 24, l. 2). He further stated, "I made these postings at night and on weekends. No one in that office, I believe, knew. I didn't tell anybody." (*Id.* at p. 28, l. 16–18).[19]

Perricone indicated that he did not positively know the source of various "leaks" of information occurring at various times on various criminal prosecutions over his years at the U.S. Attorney's Office. When asked to speculate, he suspected there were "multiple leakers" (*Id.* at p. 52, l. 23–24), and further expressed his belief that leaks of grand jury information were sourced at the Federal Bureau of Investigation ("FBI") (*Id.* at p. 89, l. 22–90, l. 1; p. 93, l. 15–20).[20] When asked specifically about "leaks" occurring relative to the investigation, grand jury proceedings, and prosecution of the Danziger case, however, Perricone stated: "Well, I've always suspected that the FBI had

---

**18.** Q. In addition to "legacyusa," "Henry Mencken," "dramatis personae," and "campstblue," did you use any other screen names on NOLA.com?
A. I have no recollection of using any other names, no, sir.
Q. Okay. What about "TANFOGLIO51"?
A. No. That, for sure, I would never use. Which I've never heard of that name.
Q. "Jeff Corrupt"?
A. No.
Q. "Toomuchcorruption"?
A. No.
Q. "E–W–E man"?
A. No.
Q. Do you know who any of those people are?
A. No.
(October 10, 2012 Transcript, p. 19, l. 8–22).

**19.** Perricone clarified by stating, "I recall maybe a handful, but most of these things

were done at night, at home on weekends." "But did I do any on work time, a handful, perhaps." (*Id.* at p. 29, l. 3–4 and 8).

**20.** This testimony was not the first time Perricone suggested the FBI as the source of leaks of confidential information: On November 27, 2011, at 3:34 p.m., Perricone/HenryL.Mencken1951 commented after a *Times Picayune* article about the "Wrinkled Robe" investigation that featured FBI Supervisor Charles McGinty, stating: "Well Mr. [Drew] Broach, it appears you found your leak!". This comment followed one posted by "eweman" on the same date two hours and fifteen minutes earlier, also criticizing McGinty. During his October 10, 2012 appearance, Perricone also twice described former FBI Special–Agent–in–Charge James Bernazzani as "pretty vocal." (October 10, 2012 Transcript, p. 86, l. 22–p. 87, l. 2).

loose lips, but I don't know anything about Danziger." (*Id.* at p. 94, l. 7–9). Perricone asserted that he was not assigned to the Danziger case in any respect, was not privy to certain confidential and/or Rule 6(e) information, and did not leak any information regarding the entry of a guilty plea by Michael Lohman or anyone else in the Danziger case. (*Id.* at p. 46, l. 16–18, p. 47, l. 1–8, p. 47, l. 1–8, p. 62, l. 9–25, p. 63, l. 1–20, pp. 68–69, l. 1, p. 76, l. 22–25, p. 77, l. 1–18, p. 90, l. 23–25, p. 100, l. 21–25, p. 101, l. 11–16, p. 105, l. 18–23, p. 108, p. 112, l. 15–25, pp. 113–115, p. 116, l. 8–25, p. 117, l. 11–25, pp. 118–119, p. 120, l. 1–12, p. 121, l. 2–12, p. 122, l. 3–15, p. 123, l. 16–20).

At the conclusion of Perricone's testimony, he and his counsel were excused. The Court advised counsel that another status conference would be held, and that former AUSA Michael Magner and his counsel would be invited to attend. The undersigned further expressed a desire to interview, one-on-one and without any counsel present, certain United States Attorney's Office personnel identified in the emails previously produced by the government, to discuss their knowledge of issues raised herein. No objection was lodged, and times were set for both the status conference with former AUSA Magner and the interviews of the U.S. Attorney's Office personnel during the week of October 29, 2012. Due to bad weather preventing the travel of government counsel (specifically lead prosecutor Barbara Bernstein) from Washington, D.C., to New Orleans on October 31, 2012, the status conference was rescheduled to Wednesday, November 7, 2012; the interviews (except one) were to be rescheduled following the status conference.

Just prior to the conclusion of the October 10, 2012 status conference, the undersigned commented on the inappropriateness and impropriety of persons engaged in certain professions, such as lawyers, government employees and other public sector workers, and persons who handle sensitive/confidential information, for instance, in posting unprofessional opinions, unauthorized comments, or even some factual statements hidden behind the mask of an online alias regarding matters related to their professions or employment. During a discussion with all counsel participating, First AUSA Mann indicated her belief that certain individuals, perhaps even employees of this Court, posted opinions on nola.com. Finding this assertion quite unsettling over the next few days, the undersigned hand delivered a letter to First AUSA Mann on October 16, 2012, making the following request:

> I am writing to request that U.S. Attorney's Office personnel, both now and in the future, provide me with the identities of any persons employed in this district by the court or any of the related agencies, e.g., Probation Office and U.S. Marshals Service, posting information *about pending court proceedings* to the extent it can be ascertained with reliable factual information. As you know, I have been and remain keenly interested in maintaining the integrity of the court's processes, including the handling of sensitive information (which may be confidential), as well as the public's perception that all court proceedings are handled in a fair and impartial manner by those involved in them, including court personnel. I trust that Jim [Letten] and you share my interest.

On October 19, 2012, First AUSA Mann responded by letter:

> I am writing in response to your October 16, 2012 letter requesting personnel of the U.S. Attorney's Office advise you if we ever know about a court employee improperly posting. To clarify, I did not

intend to cast aspersions on anyone in particular but rather was suggesting to the defense attorneys that "he who is without sin among you, let him cast the first stone."

In what I believed was a philosophical discussion after the conclusion of the status conference, I suppose I rather inarticulately suggested that post-Perricone I have concluded that there were individuals at every level who were making comments anonymously on nola.com (not necessarily divulging confidential information but voicing their opinions). **Prior to the Perricone incident, I was not a follower of nola.com postings and had no real sense of what was happening there.** Since then, I have read most of the articles and accompanying comments in which Perricone participated and also have had discussion with folks who bring up the subject when they find out where I work. I merely meant to say that the defense attorneys were being broadly judgmental to assert that the government alone had been posting about cases and they should acknowledge that their own criminal defense bar and others including employees of the various courthouses were possibly doing so as well.

I believe that the Perricone incident was a valuable teaching moment for everyone about the perils of the internet, recognizing depression and burnout and several other of life's pitfalls. I find interesting, when I have the luxury of separating myself from it, the First Amendment implications as well as issues of freedom of the press and other policy and practical considerations. **In trying to express these thoughts about human failings and flaws, about hypocrisy and hidden agendas, I did not intend to suggest that anyone else in particular was posting. If I was so perceived, I regret it.**

We are now keenly aware of potential for individuals posting and will remain vigilant for abuses.

(Bold face is added emphasis).

On November 1, 2012, the undersigned proceeded with an interview of AUSA Julia Evans.[21] Following the interview of AUSA Evans, the Court received via email the first notification from counsel for defendant Bowen objecting to any further *ex parte in-camera* interviews with U.S. Attorney's Office personnel, and indicating defense counsel's desire to be present. In response, because of the sensitive nature of these interviews, along with the fact that none of the U.S. Attorney's Office personnel whom the Court wished to interview had ever been identified as a witness by Defendants, the Court simply cancelled those interviews while the Motion for New Trial is pending, and will not proceed further with them in light of the objection.[22]

### VIII. Another Shoe Drops/Another "Secret"—Friday, November 2, 2012

Before the Court could convene the status conference at which time former AUSA Magner might speak, a significant

---

**21.** AUSA Evans was a signatory on the original indictment filed on July 12, 2010; a motion to withdraw as counsel of record, without explanation or reason given, was filed on May 3, 2011, and was granted on May 5, 2011. The Court has confirmed with AUSA Evans that her withdrawal as counsel in this matter was not based upon any of the events described herein, or any other perception of misconduct or other improper behavior by anyone involved in the prosecution of this case.

**22.** The Court has indicated, however, that it may seek these U.S. Attorney's Office personnel for further information following ruling on the Motion for New Trial.

intervening event occurred: On Friday, November 2, 2012, at 9:52 a.m., a petition entitled *Frederick R. Heebe v. Jan Maselli Mann,* was filed in the Civil District Court for the Parish of Orleans, State of Louisiana, and assigned Docket No. 2012–10298. In it, the plaintiff alleged that First AUSA Mann had, in fact, also posted inappropriate comments on nola.com ostensibly between the dates of November 2011 and March 2012; and that she immediately ceased such activity when Perricone was exposed as "HenryL.Mencken1951." The petition further alleges that First AUSA Mann's posts, made under the fictitious name "eweman", extensively discussed the U.S. Attorney's Office and many of the cases that have been handled by it over the years, including at least one post related to this case. It is alleged that approximately 63 per cent of the posts by "eweman" (First AUSA Mann) appear with comments posted by Perricone, and they frequently reply to express consistency with the points of view expressed by the other.[23] The petition sets forth in detailed analytical fashion certain specific distinguishing features of "eweman's" writing style, as compared to that of First AUSA Mann, and concludes with the allegation that First AUSA Mann, under cover of the alias "eweman", defamed the plaintiff.

Having not heard from anyone at DOJ or the U.S. Attorney's Office by the close of business on Monday, November 5, 2012, the undersigned, on Tuesday, November 6th, had a letter hand-delivered to the U.S. Attorney seeking a simple admission or denial of the allegation that First AUSA Mann posted under the name "eweman"; and indicating that if such denial were not forthcoming, First AUSA Mann would not be permitted to attend the November 7th status conference purporting to represent the interests of the United States. That afternoon, U.S. Attorney Jim Letten personally advised the undersigned that, the day before, much to his surprise, First AUSA Mann admitted to public postings on nola.com, and that she would not be attending the status conference the next morning.

## IX. The November 7, 2012 Status Conference—Michael Magner

On the morning of November 7, 2012, the Court convened a status conference with all counsel present, except First AUSA Mann. U.S. Attorney Jim Letten attended. Former AUSA Mike Magner[24] and his counsel appeared; the Court again had a court reporter in attendance.

Former AUSA Magner was placed under oath,[25] and indicated that he first learned that his former AUSA colleague, Perricone, might be posting on nola.com as "legacyusa" in or around December 2010. (November 7, 2012 Transcript, p. 5, l. 21–25, p. 6, l. 1–15, p. 11, l. 5–25, p. 12, p. 33. l. 7–25, p. 34–p. 37, l. 1–3). It had been brought to Magner's attention that several posts of a critical or negative nature, some singling Magner out for *ad hominem* attack on his professional skills, appeared during the trial of the *"Glover"* matter, *United States v. Warren, et al.,* USDC–EDLA Criminal Action No. 10–154, which occurred between the dates of November 8, 2010, and December 9, 2010. (*Id.*). Then, in December 2010, a former EDLA colleague still in the employ of the DOJ, but stationed overseas, communicated to

---

**23.** The majority of the "eweman" posts were in evenings and weekends, but, like Perricone's, some were during regular work-day hours.

**24.** Magner left the U.S. Attorney's Office at the end of 2011 to enter private practice.

**25.** The transcript of Magner's testimony, except as set forth herein, is sealed.

Magner his belief that Perricone was "legacyusa." (*Id.*).

Thereafter, although Magner was unclear as to the approximate dates of his conversations with supervisory personnel in the U.S. Attorney's Office, he indicated that he discussed his suspicion with "a number of supervisors in the office." (*Id.* at p. 10, l. 3–5). In response to questioning, he identified his supervisor, AUSA Greg Kennedy, Supervisor of the Anti–Terrorism Unit, with whom he shared a secretary, as one of the supervisors. (*Id.* at p. 10, l. 7–17). Magner also identified AUSA Matt Coman, Supervisor of the General Crimes Unit, and AUSA Maurice Landrieu, Supervisor of the Drugs Crime Unit, as supervisory personnel whom he had advised of his suspicion that then-Senior Litigation Counsel AUSA Perricone was the person posting such comments under "legacyusa", although without confirmation and/or proof. (*Id.* at p. 10, l. 18–25, p. 14, l. 4–22, p. 20, l. 21–24, p. 21, l. 5–6). He further testified that those supervisory individuals did not wish to become "enmeshed" in the allegation, and were not "willing to take that risk" if Magner's suspicion could not be proven. (*Id.* at p. 10, l. 10–25).[26] Magner himself testified that he did not advise U.S. Attorney Jim Letten of his suspicions (lest they could not be proven), nor did he report them to First AUSA Mann—nor did he confront Perricone. (*Id.* at p. 25, l. 25, p. 26, l. 1–18, p. 37, l. 14–22, p. 38, l. 22–24, p. 39, l. 8–21). Magner however, did share his suspicions with other non-supervisory AUSAs in the office, as

evidenced by the emails produced by the government in response to this Court's Order, and as he so testified. (*Id.* at p. 9, l. 5–10, p. 16, l. 7–22). Additionally, in April 2011, while in trial prosecuting a case against a former NOPD officer unrelated to this matter, Magner called former NOPD Captain Louis Dabdoub as a witness. In his outside-the-courtroom discussions with Dabdoub, Magner shared his suspicion that Perricone had posted uncomplimentary "very critical remarks" about Dabdoub on nola.com, which Magner felt Dabdoub needed to know "for his own protection." (*Id.* at p. 13, l. 9–11).

Further, regarding former First AUSA Jan Mann, AUSA Jim Mann, and U.S. Attorney Letten, Magner indicated that he was unaware that First AUSA Mann was posting comments online until he heard of the *Heebe* petition filed on the previous Friday (November 2, 2012). (*Id.* at p. 19, l. 5–9). With regard to Perricone's online posting activities, Magner testified that "Mr. Perricone's best friend in the office was Jim Mann [husband of First AUSA Jan Mann] who was the White Collar supervisor." (*Id.* at p. 26, l. 5–6). Magner additionally was asked directly:

Q. Do you find it conceivable that [First AUSA] Jan Mann did not know Sal Perricone was blogging?

A. I don't find that to be credible.

Q. Okay. What about Mr. Letten?

A. I could conceive of—I can conceive that Mr. Letten might not know. I think he wants to think the best of people.

---

26. Magner stated:

A. Well, I'll just speak in terms of my feelings or my perceptions. I didn't think anything would happen if I did. I thought I would be rebuffed. To some degree, I feared some retaliation if I did, professionally. I also thought that Mr. Perricone was a loose cannon and I was concerned about personal retaliation from him.

Also, I didn't like Sal Perricone, he didn't like me and that was fairly well known within the office. So my perception was that if I had come forward with my suspicions that they would have been—they would not have been well taken.

(November 7, 2012 Transcript, p. 24, l. 7–17)

Q. Okay. And could you conceive also that Jan Mann would have perhaps tried to keep it from Mr. Letten?

A. I don't know how this most recent chapter will play out. I don't know if that was, in fact, Mrs. Mann. If it was Mrs. Mann who was also blogging under the "eweman" name, then I could conceive of her concealing that from Mr. Letten—concealing her own activities and Mr. Perricone's activities, but I don't know that.

Q. What about Jim Mann?

A. I have a very difficult time believing that he would not be aware of Mr. Perricone's activities.

Q. Based on?

A. Their close relationship; and from what I observed, many of those posts were during the workday when they spent a great deal of time together.

Q. In the same office?

A. I mean, they—they were very close with each other and spent a lot of time together.

(*Id.* at p. 27, l. 5–25—p. 28, l. 1–3).

Magner testified that he was not involved in and did not follow any of the investigation, grand jury proceedings, and/or trial in this matter. (*Id.* at p. 29, l. 22–24, p. 30, l. 2–5, p. 42, l. 8–24, p. 44, l. 6–25, p. 45, l. 9–11, 17–25). Moreover, he knew of no leaking of information regarding grand jury proceedings by the government trial team in this matter, nor of any online posting by the trial team. (*Id.* at p. 38, l. 3–5, p. 39, l. 1, p. 41, l. 17–22, p. 42, l.1–7, p. 43, l. 4–5, p. 51, l. 11–22, p. 52, l. 17–25, p. 53, l. 1–9, p. 54, l. 1–10). He was unaware of any wrongdoing by attorneys involved in the prosecution of this matter. (*Id.* at p. 51, l. 11–22). He did state that, during the relevant time periods, former First AUSA Mann and former Senior Litigation Counsel AUSA Perricone, through their job responsibilities, would have had access to "everything or just about everything" going on in the United States Attorney's Office, including pre-indictment proceedings in this case. (*Id.* at p. l. 13–20).

At the conclusion of Magner's testimony, he and his counsel were excused. At that time, DOJ Deputy Chief and lead trial counsel Barbara Bernstein read the following prepared statement:

In light of new information that has come to light, I want to state something unequivocally as an officer of the court. I had no idea until the story broke in the news that Sal Perricone was posting comments online. I was surprised when those allegations broke earlier this year, and I was even more surprised when it turned out to be true.

When I saw the allegations about Jan Mann last Friday, I was flabbergasted and I assumed that the allegations were false. On Monday, I heard that they were true. It had never once occurred to me to ask Jan if she had also posted online.

If I had had any inkling, even of an unproven allegation, I would have insisted that someone else represent the United States Attorney's Office in connection with this motion for a new trial.

Since the allegation against Jan broke on Friday, I have specifically asked that question of current and former members of the prosecution team. I've been in contact with Ted Carter, Cindy Chung, Julia Evans, Christy Parker, Steven Harrell, my paralegal, my supervisor in D.C., [FBI Agent] Bill Bezak, Kelly Bryson, Oneil Brown and Bobby Blythe.

All of these people have sworn to me that they never posted comments on nola. com relating to any case being prosecuted by the U.S. Attorney's Office or DOJ. And I swear to you, Your Honor, that I have never commented on

nola.com, that I had no idea that anyone from the U.S. Attorney's Office was doing so, and that there was never any concerted effort on the part of the Danziger prosecution to leak information to the press to advance the case.

I understand the Court's deep concern about the recent revelations. I remain confident that because the postings were anonymous and because this Court conducted thorough searching voir dire that the conduct at issue had no effect on the validity of our verdict in the Danziger case.

And as troubling as the new revelations about Jan Mann are, Jan's postings are particularly irrelevant to this particular motion as her comments, as far as I understand, based on the allegations in the civil suit, didn't even begin until several months after the trial ended.

(*Id.* at p. 56, l. 14–p. 58, l. 2). Indeed, the record contains no evidence that Bernstein or U.S. Attorney Jim Letten were aware of the public postings of Perricone and/or First AUSA Mann until such time the *Heebe* petitions were filed against each. Although the Court accepts this lack of knowledge by Bernstein and Letten, unfortunately, from the Court's perspective, more questions abound than ever about Perricone, former First AUSA Mann, and possibly others.

## X. Thursday, November 8, 2012

On Thursday, November 8, 2012, U.S. Attorney Letten released a public statement concerning First AUSA Mann's activities, wherein he stated:

> Immediately upon learning of the allegations contained in Mr. Heebe's lawsuit, I notified and maintained close contact with the appropriate U.S. Department of Justice officials in Washington, D.C. in order to determine the appropriate course of action. In accordance with well-established protocol, the Department of Justice Office of Professional Responsibility was notified.

> Assistant U.S. Attorney Mann used NOLA.com to post comments. As of Monday night, November 5, 2012, AUSA Jan Maselli Mann is no longer serving in the supervisory positions of First Assistant United States Attorney or Chief of the Criminal Division.

> Because this matter is now under review by the Department of Justice in Washington, D.C., the release of any additional information by my office would not be appropriate.

As of the signing of this Order, it is the undersigned's understanding that former AUSA Jan Mann remains employed as an AUSA in the Eastern District of Louisiana.

## *PART II*

In light of all of these unfortunate events, the Court is faced with two general concerns, which overlap to some degree: (1) What is the full extent of the misconduct, and what are the institutional ramifications of such misconduct uncovered thus far; and (2) how does such misconduct, both that which has in fact occurred and that which is believed by Defendants to have occurred, impact the validity of the verdicts in this case under Federal Rule of Criminal Procedure 33?

## I. The Government: AUSAs And The DOJ

### A. Perricone

Former AUSA Perricone resigned shortly after the revelation that he had improperly posted comments about cases under investigation, or pending trials, or defense counsel and defendants, among others. Although his conduct is and was supposed to be under investigation by the DOJ OPR, he apparently had not been

asked questions under oath until required to do so by this Court in October. As it stands now, it seems clear that Perricone testified falsely in at least some important respects: first of all, his statement that no one in the office was aware that he was posting surely is false. As Senior Litigation Counsel, he and former First AUSA Mann worked very closely together, as did his close friend, AUSA Jim Mann, the husband of former First AUSA Jan Mann. Indeed, Perricone and the Manns were widely considered the triumvirate responsible for managing many broad aspects of the U.S. Attorney's Office. Quite simply, no one, especially this Court, could reasonably find it credible that Perricone and former First AUSA Mann, while posting under the same nola.com articles, and responding to and echoing each other's posts, were unaware of the identity of the other. Any assertion to the contrary belies the fact that both Perricone and then-First AUSA Mann are highly intelligent, experienced investigators and very capable prosecutors; and it is truly hard to believe that such seasoned, savvy and keenly insightful individuals, charged with unraveling the most complex white collar crimes in this District, would completely and totally overlook such an obvious thing, especially considering the information set forth in the posts of each. To even think as much strains credulity well beyond the breaking point. Surely, the particular posts of "eweman" and "legacyusa", et al., stood out quite dramatically amongst the quotidian posts of many others.

In that regard, Perricone was specifically asked whether he knew the identity of the person posting under "eweman", he stated unequivocally, "No." (October 10, 2012 Transcript, p. 19, l. 19–22). The undersigned finds it inconceivable that Perricone did not know, at the time he gave sworn testimony, that "eweman" was seated only two chairs away, on the other side of prosecutor Bernstein, in the person of former First AUSA Mann. The undersigned also finds Perricone's testimony highly questionable regarding his use of the name "campstblue." Though Perricone attempted to distinguish his "campstblue" from some variations of it, and also sought to blame unknown persons at nola.com or elsewhere for posting things under his alias "campstblue", these tenuous explanations seem only designed to afford him an escape hatch from some of his most egregious postings, such as that made against former Mayor Nagin in June 2009 (of which he denied any recollection).

Further, Perricone, admitting he did post comments about former NOPD Captain Louis Dabdoub (as suspected by Magner), claimed ownership of comments that easily could be construed as being negative about Dabdoub's consideration as a candidate for NOPD Chief in April 2010. Under an article entitled "Six Final New Orleans Police Chief Candidates Named" (April 26, 2010), in which Dabdoub was included as one of the six, Perricone/legacyusa posted: "Not so fast on Dabdoub . . . the committee should speak to the Feds before EVER considering him . . . just a suggestion." Regarding that same article, Perricone/legacyusa also posted: "I know you [Mayor Landrieu] spent 20K on the IACP, but is this the best they can do? Serpas and DabaDabaDOOOO? and Four guys, albiet paper-qualified, but lack the understanding of New Orleans? ? ? Keep looking, Mitch don't rush this!!!!!!!" [sic]. But, at the same time Perricone insisted on October 10, 2012 that "I don't know anything negative about Louis Dabdoub." (October 10, 2012 Transcript, p. 59, l. 20–21); and also, "So you know . . . I have no—I have no reason to trash Louis Dabdoub." (October 10, 2012 Transcript, p.

61, l. 8–9).[27] Reasonable minds would not disagree that these posts are negative and highly detrimental to Capt. Dabdoub.

Unfortunately, Perricone's questionable testimony regarding his postings as "campstblue" does not end here. On July 3, 2008, campstblue posted a comment under an article that mentioned former New Orleans City Councilman James Carter. According to Perricone/campstblue: "James Carter feels entitled. Ask the developers of Algiers Crossing. There's a tip for you curious reporters at the TP [*Times Picayune* newspaper]." Later, on September 17, 2011, Perricone/HenryL.Mencken1951 followed up on this disclosure: "Though, when is somebody going to ask Carter what his involvement was in the failed Algiers Landing project? Now there's a little story." On October 10, 2012, when questioned, Perricone tried to explain:

THE WITNESS: Let me tell you what this is about, the whole story. I'm sitting in CC's one day, before Katrina, two guys from the 4th District in Algiers are talking about how the police department is downgrading signals when tourists are crossing the ferry landing over at the Algiers Point.

This is an endemic problem in the police department, downgrading signals. There are people getting robbed and they're downgrading to 21's to lost-or-stolen to get the stats down.

MR. LITCHFIELD: Explain what you mean by "signals."

THE WITNESS: Signals are what's— you know what the UCRs, Uniform Crime Reports, for the FBI, they were downgrading the calls on signals.

These 4th District guys saw me at CC's over across the street and they came to me and complained about their commanders telling them to downgrade the calls and monkey around with the UCR figures.

I said, "If you can't get satisfaction from the police department, go talk to the city councilman, Carter." He says, "Are you kidding me? He's involved in it." That's what this is about.

(October 10, 2012 Transcript, p. 38, l. 25–p. 39, l. 20).

Now, what I was talking about here was downgrading the UCRs because tourists were getting jacked up when they came off of the ferry landing. But your friend, Gordon Russell—and I'm under oath here—your friend, Gordon Russell, went out and got two people to confirm that there was an investigation.

(*Id.* at p. 40, l. 2–7). Following counsel's questioning, and finding Perricone's description oddly incongruous with the posts' reference to the "developers" and "the failed Algiers Landing project", the Court probed further:

THE COURT: Let me ask you one last question on this before we move on. Why mention of the developers?

THE WITNESS: I don't know why I used that word.

THE COURT: What would the developers have to do with the circumstance that you've described in detail about?

THE WITNESS: A poor choice of words.

27. On p. 75, l. 13–18, Perricone was again asked:

Q. Well, we've talked about Dabdoub. Did you attack Dabdoub?
A. No.

Q. So telling the feds to look at Dabdoub, you don't consider that an attack against him?
A. No. I have nothing negative to say about Louis Dabdoub. Like I said, I knew his dad. His dad was a great cop.

MR. LITCHFIELD: Your Honor, I don't see—I mean I'm just—may be looking at it for the first time. I don't see *developers* in here.

THE COURT: It's in the previous one.

MR. GIBBENS: The first one, 20–A.

THE COURT: I don't see what they would have to do with the controversy that you've just described involving the police.

MR. LITCHFIELD: This is the "campstblue" comment?

THE COURT: Uh-huh.

THE WITNESS: That's the one I don't have any recollection of writing, Judge.

THE COURT: All right.

THE WITNESS: You know, looking at the entire comment in toto: "They feel entitled." I don't remember writing that. Like I said, I don't trust this nola.com at all.

(*Id.* at p. 41, l. 14—p. 42, l. 10). The undersigned reiterates his concern that the explanation offered by Perricone is an expedient one because not only does he reference "the developers of Algiers Crossing", he also references the "failed Algiers Landing project"; neither of which would involve an offhand conversation with NOPD officers about downgrading UCRs.

Given these troubling aspects of Perricone's sworn testimony, the Court must question the credibility of such testimony. Rather, Perricone's admitted motivation appears to be designed to insulate others, particularly First AUSA Mann and perhaps other AUSAs, from responsibility, i.e., "damage control." Perricone admitted in the *New Orleans Magazine* article that his motive for even submitting to that interview was to clear the U.S. Attorney

and the 120 other "dedicated, hardworking employees of the U.S. Attorney's Office of any responsibility for his internet acts, . . ." Indeed, he made a point of stating: "Jan Mann had no idea what I was doing. This is on me. I take 100 per cent of the responsibility." We now know that this assertion, which was repeated in substance in his sworn testimony, is very likely false.

## B. Former First AUSA Mann

The Court's concerns over former First AUSA Mann's activities are greater still. Obviously, during the time that U.S. Attorney Letten was proclaiming the "gospel truth" that (to his knowledge) no one in his office, and then-First AUSA Mann specifically, were aware of Perricone's postings, she knew all along that she, too, had engaged in such misconduct. Indeed, in the very courtroom where this motion was heard on June 13, 2012, then-First AUSA Mann sat beside U.S. Attorney Letten the entire time, except when he rose to take the podium to make such a broad unequivocal assertion, yet she allowed him to do so—an act of perfidy that belied his dispositive proclamation. Moreover, on October 10, 2012, she sat through the sworn testimony of Perricone knowing full well the infirmities of his assertions and untruths which he told, as described hereinabove, and the Court's misgivings regarding his conduct. And she was also aware of the representations made thereafter in her October 19, 2012 letter to the undersigned. The Court's concern relative to former First AUSA Mann begins with possible violations of Rules 3.3(a)(1) and 3.4(b) [28] of the Rules of Professional Conduct, but it does not end there.

---

**28.** For a factually similar circumstance, see *In Re: Bruno,* No. 06–B–2791 (La.2007), an opinion from the Louisiana Supreme Court regarding attorney misconduct occurring as a

result of knowing silence by counsel when another lawyer is making a false statement to the court. *In re: Bruno,* 956 So.2d 577

## C. Further Investigation

Aside from the ugly tincture they have placed on the otherwise good name of the U.S. Attorney's Office, the Court is also concerned that the activities of Perricone and former First AUSA Mann, both those of commission and those of omission, might also constitute prosecuteable criminal conduct.[29] Thus, it might well be time for the DOJ to seriously consider appointment of an independent counsel to review the activities of Perricone and AUSA Mann, both with regard to the online postings, as well as subsequent matters before this Court as described herein.

Although in the case of Perricone and now Mann, the usual DOJ protocol appears to require simply placing the matter in the hands of the DOJ's OPR, such a plan at this point seems useless. First of all, having the DOJ investigate itself will likely only yield a delayed yet unconvincing result in which no confidence can rest. If no wrongdoing is uncovered, it will come as a surprise to no one given the conflict of interest existing between the investigator and the investigated. Moreover, the Perricone matter has been under investigation for *eight months* (since March), and yet it comes as a complete surprise to everyone at DOJ and the U.S. Attorney's Office that

another "poster" exists, especially one maintaining as high a position in the U.S. Attorney's Office. It is difficult to imagine how this could possibly have been missed by OPR, and surely raises concerns about the capabilities and adequacy of DOJ's investigatory techniques as exercised through OPR.[30] In any event, the Court has little confidence that OPR will fully investigate and come to conclusions with anywhere near the efficiency and certainty offered by suitable court-approved independent counsel. The Court **strongly** urges DOJ to do so post haste. Should DOJ determine not to proceed accordingly, the Court is left to proceed as it sees fit.

## D. The Motion Sub Judice

With regard to the pending motion for new trial, the Court is unfortunately hampered by the inability of the DOJ to provide reliable investigatory answers. The June 27, 2012 Report submitted by former First AUSA Mann is tainted and must be completely redone. To begin with, the Court gave a clear and specific instruction with regard to determining the source of apparent leaks of Rule 6(e) information. As described herein (pp. 7–8), the government failed to even formally question the media recipients of such information. Al-

(La.5/11/07) (La. May 11, 2007)(No. 06–B–2791).

29. To be sure, posting online comments such as these might be unprofessional and unethical, but not criminal. The activities before this Court, however, including *inter alia* apparent false testimony/statements (by commission or omission), suborning false testimony, and making false statements to a federal judge, bear further serious inquiry. Ironically, the defendants in this case have been accused and convicted of counts involving conduct designed to "cover up" or obscure material facts.

30. It would seem obvious that, upon news of Perricone's activities, among the first ques-

tions to be answered were: (1) Is anyone else in the U.S. Attorney's Office posting inappropriate and/or compromising online comments? and (2) Did anyone in the U.S. Attorney's Office know or suspect that Perricone was posting prior to his admission in March 2012? (Even if OPR asked the first question in March, one shudders to imagine what answer was given by First AUSA Mann. Either she confessed to such activity, or falsely denied it.) Regardless, had the DOJ proactively and independently investigated and carefully analyzed the online comments in March 2012 as did the expert who uncovered Perricone and Mann, the answer to the first question would have been known months ago.

though it was later asserted at the status conference on October 10, 2012 that, in order to question a reporter regarding his/her sources, approval must be obtained up the DOJ chain to the Attorney General, that approval was never sought by former First AUSA Mann, who supervised the investigation, nor anyone else on the government's trial team. The easiest way to determine the source of such information is simply to ask the recipient; however, this was not done. If the DOJ were truly serious about rectifying and preventing violations of Rule 6(e), it would vigorously pursue such information. Should the DOJ decline to seek and pursue the source of the Lohman plea leak, such unwillingness to learn the truth could favor the defendants' arguments herein, as it begs the question of the government's involvement in such leaks.

Moreover, because of the clear conflict of interest existing with former First AUSA Mann having investigated and reported on activities that might also include similar activities on her part, or at least her knowledge of such activities of Perricone, her June 27, 2012 Report is tendentious, unreliable and unacceptable. It was not compiled as a result of an independent investigation, and, even worse, any information gathered by former First AUSA Mann was necessarily filtered through her shaded desire to remain undetected as "eweman", having seen the disposition of her colleague Perricone only three months before. Finally, the Court simply cannot accept former First AUSA Mann's submission as "gospel truth", when she allowed U.S. Attorney Letten to make what she knew to be a grossly misinformed statement in open court the very day the Court ordered the investigation into the leak(s).

Likewise, former First AUSA Mann supervised the search for responsive emails in connection with this Court's Order of July 9, 2012. Some of those emails have proven to be particularly insightful with regard to Defendant's arguments. Of course, given that First AUSA Mann gathered, and again sorted them through the filter of the unique knowledge of her own activities, the resulting submission to the Court is suspect. This effort, too, must be recommenced.

On the other hand, even in light of such skulduggery by the government, Defendants have thus far failed to demonstrate that their convictions should be overturned as a result. Defendants claim that, putting aside whether their jury was subject to extensive voir dire (indeed it was), other persons, including key witnesses in their trial, were pressured (both face-to-face and by the general atmosphere created) into cooperating with the government and pleading guilty to crimes carrying significantly lesser statutory maximum terms in prison in exchange for testimony most useful to the government, regardless of the true facts. *See, e.g., Stroble v. State of California*, 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872 (1952); and in particular, *United States v. Ruehle*, No. 08–00139/00140 (USDC–Cent.Dist.Ca), Transcript of Tuesday, December 15, 2009.[31] Defendants also claim that the posting of comments online by Perricone during trial of this matter, as set forth below, may have influenced testimony of certain witnesses, including cooperating defendants.

---

**31.** In another stroke of irony, an article relating the events resulting in the dismissal of charges in the *Ruehle* matter was circulated by email to the attorneys in the United States Attorney's Office on December 15, 2009, by First AUSA Mann with the notation: "In case you were thinking of leaking to the press, think again ... A case in California was dismissed for prosecutorial misconduct after the AUSA admitted leaking among other problems."

Relative to Defendants' assertions, the undersigned has thus far discerned this much: The emails in the Court's August 13, 2012 Order relate to and/or establish the following:

(1) Certain members of the United States Attorney's Office consciously monitored and reviewed nola. com articles, and, in particular, the public "comment" postings underneath, and shared them with AUSA colleagues.

(2) At some point in time, some members of the United States Attorney's Office determined that these posts were suspicious in that they seemed to contain confidential, privileged, or "sensitive" information about a variety of cases in which the United States Attorney's Office was involved. In other words, the postings were not merely innocuous opinions of (frequently uninformed) members of the general public, but were rather pointedly familiar with particular internal facts that were not public knowledge.

(3) Certain members of the United States Attorney's Office. commented to each other regarding their suspicions of particular posters, including one operating under the name of "legacyusa" and another using the name "HenryL.Mencken1951." Some of the emails suggest that suspicion (or knowledge) pointed specifically to Senior Litigation Counsel AUSA Perricone.

. (4) With regard to this prosecution, prior counsel of record in this case, AUSA Julia Evans, stated via email on March 3, 2010, "I am really fascinated with the comments about the [Danziger] case on the blogs, especially Nola.com.", and in response to AUSA Edward J. Rivera's query, observed, "what is strange is that there are people posting on the blogs who know a little bit too much about our office, the [Danziger] case itself, and former civil rights cases we've done." This last email is dated March 3, 2010, only a week after the Lohman plea and 131 days before the July 12, 2010 indictment in this case. This post further suggests to the undersigned that the "people posting on the blogs" might not be defense counsel, defendants, NOPD personnel, or another "nongovernmental source", as alleged by the government, but rather someone who knows "a little bit too much" about the United States Attorney's Office, the Danziger case in particular, and former civil rights cases "we've done" (meaning the government, not including the defendants, their attorneys or NOPD personnel), suggesting the person posting the comments has broader knowledge than simply a person involved in *only* the Danziger matter.

(5) First AUSA Mann supervised two critical submissions to this Court, the June 27, 2012 "Report of Inquiry" and the response to the Court's July 9, 2012 Order requiring the production of any and all email between U.S. Attorney's Office personnel regarding posting on nola.com, upon both of which this Court relied to determine the merit of Defendants' motion for new trial up to the current date.

Were Perricone's postings about topics unrelated to Danziger and/or NOPD misconduct, such reprehensible activity would be of no moment with regard to the verdicts herein.[32] During that time, however, Perricone, under one or more of his monikers, publicly posted on nola.com the follow-

---

**32.** At the current time, the posts of First AUSA Mann as "eweman" appear to have begun in November 2011, after the completion of trial herein. In the event it is later discovered that she posted earlier, as ."eweman" or under a different online handle (as did Perricone), and such posts relate to this trial, that may impact the subject motion as well.

ing remarks in the months before the July 12, 2010 indictment herein: [33]

On February 20, 2010, at 8:23 a.m.:

[Kaufman defense attorney Steve] **London just hung his client.** Dumbutt statements. My God, anyone who knows anything about Federal investigations know that invitations to the Grand Jury are perfunctory. They must invite targets, London, lest your client take the stand at trial and cry. "they didn't give me a chance to explain." Dumb London, very Dumb.

On February 23, 2010, at 10:44 p.m.:

The cover up is always worse than the crime. **Archie [Kaufman], your time is up.**

On February 23, 2010, at 6:17 p.m.:

**Despite defense attorneys protestations to the contrary, It would be prudent for those involve to consider the track record of the U.S. Attorney's Office.** Letten's people are not to be trifled with.

On February 26, 2010 at 7:04 a.m.:

I am afraid that the NOPD has inoperable cancer. It must be completely and comprehensively rebuilt, including a culturing change which will kill the current patient. But that is good. For too long, way too long, the NOPD has enjoyed an insular existence, separated from reality and control. The current events are revelatory, but not curative. The government MUST step in and take over this agency now. We can not allow this police department to exist in the world it now exist. It must be stopped and stopped now. Too many officers' loyalty and devotion to duty is not to the citizens but to themselves and their own self-interest. Indeed, the fish has rotten from the head down.

Then, on November 19, 2010, at 7:49 a.m., during the *Glover* trial involving post-Katrina NOPD misconduct:

Let me see if I understand this: The cops, through their attorneys, admitted that they shot Glover and then burned the body in a car that belonged to another man, who was not arrested for anything ... RIGHT??? **Guilty!! Now, let's get on to Danzinger.**

On December 12, 2010, at 10:34 a.m.:

**There is no Katrina defense.** The jury responded in the Warren [*Glover*] matter, not by the stress of Katrina, but by split-second decision of Warren to what he perceived was a threat. The writers of this article don't understand that; I thought the lawyers quoted herein would, but they don't. **Danzinger is totally different. I am sure the attorneys will proffer this defense, but it will fail.** The facts and circumstances are totally different. What was in Mr. Warren's sight picture and mind, was totally different in what was in the minds of the **gang of thugs (NOPD) on the bridge** that day. They bailed out the rental truck, guns ablazing. Officer Hunter, recently sentence, shot in the air. (??????) WTF!! The others should have done the same, but they, like their brothers in Algiers, thought they were the law and no one would ever question them. WRONG!!

On June 22, 2011, this Court and counsel began jury selection herein. Only ten minutes before, at 8:19 a.m., Perricone posted:

**NONE of these guys should had have ever been given a badge.** We should research how they got on the police department, who trained them, who supervised them and why were they ever

---

**33.** The following posts are quoted as they appeared online, with the same spelling, punctuation, spacing, etc. The boldface type, however, is emphasis added.

been promoted. **You put crap in—you get crap out!!!**

On July 24, 2011, at 10:28 a.m., as Defendants were presenting their case, Perricone posted:

I love the juxtapostion. **In one part of the courthouse we have corrupt New Orleans cops on trial.** And in another part of the courthouse we have this paragon of virtue defending herself for behavior when she was a New Orleans city council PERSON. What a town!!!!!

On July 25, 2011, at 11:32 a.m., Perricone took a critical shot at the testimony of defense witness Warren Riley, former NOPD Superintendent:

**He can't remember which deputy chief he instructed to conduct investigations of police shootings????** Thank God he's not chief anymore. Looks like he's reached his capacity for competence at Southern [University].

Defendant Robert Faulcon was the only defendant to testify at trial. On July 28, 2011, at 8:16 a.m., Perricone could not resist giving his public opinion, posted on nola.com, of defendant Faulcon's testimony:

**Where is Madison's gun? Come on officer, tell us.** You shot because you wanted be part of something, you thought, was bigger than you. You let your ego control your emotions. You wanted to be viewed as a big man among the other officers. **That's the creed of the NOPD and I hope the jury ignores your lame explanation and renders justice for Mr. Madison. To do less, is to sanction any cop who decides it is in his best interest to put a load of buckshot in the back of a disabled american in broad daylight.**

On July 28, 2011, at 5:48 p.m.:

**Always a loser.** [*commenting on Kaufman's attorney, Stephen London* ].

On July 30, 2011, at 8:44 a.m., as the evidentiary portion of the trial concluded, Perricone "convicted" Kaufman:

**Bye—Bye Archie** [Kaufman]. . . .

On August 2, 2011, at 10:27 a.m., as closing arguments began in this matter, Perricone focused on NOPD corruption:

This is a well-reasoned opinion, but it's to facile to leave unremaked. [NOPD Captain] **DeFillo, as someone opined, is and of the corrupt culture of the NOPD. It's been there for years and will be until the DOJ leashes it to a Consent Decree.** That being said, DeFillo should not slip away without some penalty or sanction. His purposeful, dilatory and yes, corrupt silence only embolded those actually involved in Glover case to pursue a pattern of concealment and lies. A federal jury had to untie the conspiratorial knot. But how did it get to this. As the DOJ acutely noticed in their letter to the mayor last March, the detail system at the NOPD is at the heart of the corrupt practices of the police department. Seems to simple, huh? But consider this. DeFillo, by all indications, ran and coordinated a bunch of lucrative details at the NOPD. These details created alliances and allegiances which don't appear on any organizational chart on Broad Street. These alliances and allegiances, over the years, have made subordinates superiors off-duty, while superiors became subornidates all for the sake of securing details. Many knew what DeFillo was doing and he knew they knew. So, when Mr. Glover appeared at the Habans school bleeding his guts out in the back of Mr. Tanner's car, who was the superior? Who was the subordinate? Why would DeFillo go after his subordinates, like Wynn for example, if he, DeFillo, knew that his little game at NOPD HQ would be exposed. Remember the alliances and al-

legiances—they survived Katrina—Mr. Glover didn't. ps: isn't it curious that the first major scandal to hit Serpas had to do with a paid detail?

Early on August 3, 2011, the first day of the jury's deliberations, Perricone weighed in, at 7:06 a.m.:

I agree with [nola.com poster] Cauane. The same hurricane that hit Orleans Parish, hit Jefferson, St. Bernard, Plaquemine, and St. Tammany. Yet, the only police force to use deadly force throughout the city was the venerable NOPD. Perhaps we would be safer if the NOPD would leave next hurricanes and let the National Guard assume all law enforcement duties. **GUILTY AS CHARGED.** [caps as published; bold added].

And on August 3, 2011, at 8:57 a.m.:

Agree. **With all the shots fired on the bridge that day, how many hit an ARMED subject? Listen to the video.**

On August 4, 2011, the jury's deliberations continued. At 5:53 p.m., as the second day of deliberations concluded, Perricone mused:

**I don't think the jury will leave the dead and wounded on the bridge.**

On August 5, 2011, the jury returned its verdict. At 11 p.m. that evening, Perricone opined:

There's an old Italian proverb that goes something like this: the fish rots from the head down. And the proverb applies to the New Orleans Police Department. Of all the law enforcement agencies in the metropolitan area the NOPD was the ONLY one to kill people after Katrina—on BOTH sides of the river. Now, we, as a society, must ask why. Abiding by the proverb, the only unassailable answer is the paucity of leadership at the NOPD before, during and after Katrina slammed New Orleans.

In fact, I submit there was no leadership and that which existed, was woefully unqualified to occupy those positions. And as events unfolded, we now see that that was the case. What a failure Eddie Compass prove to be! And his underlings were/are no better. Where was the leadership before Katrina? Where the officers prepared for adverse conditions? Where they trained to handle a society shattered by the storm? Where they reminded and lead to serve a public unders stress? Where the commanders reminded to watch their men to see if they're were about to bust? What paradigm did they operate under? It appears to be Lord of the Flies. The NOPD is a failed organization. No one can dispute that. We all can only hope that the ONLY police department in this city has enough bits and pieces left to put a reliable, trustworthy, ethical, and legally efficient agency together—one with the right leadership, even when the weather is bad. The DOJ can not get here fast enough. Without their help and supervision the NOPD will not be remediated or redeemed.

And on August 9, 2011, at 7:59 a.m.:

"Correction: Sunday's column described convicted officer Kenneth Bowen as stomping on the lifeless body of Ronald Madison. In fact, testimony indicated Madison was alive at the time." •• A distinction devoid of a difference. While I'm sure Mr. Bowen—now inmate Bowen—appreciates the correction, I'm sure Mr. Madison is insentient of the good will of the sentiment. **The entire weft of the NOPD's culture was on trial in this horrid episode. The DOJ assembled a great team which had institutional support beyond the TP's comprehension.** We can only imagine what this city would be like without the DOJ. Some NOPD officers, I would assert, are musing the same thing.

And less that four hours later, on August 9, 2011, at 11:43 a.m.:

**Danzinger is a result of a failed command structure at the NOPD.** Indeed, not long after this event, Chief Compass was ingnomaniously relieved of his command. But closer to the point, there was no command structure at the bridge—only rage and errant undisciplined fire. If one cool head had been there, perhaps the police would not have fired, people would be alive, and the population of the Federal prison system would not be increasing by a factor of five. Yes, poor or ineffectual police control contributed to Danzinger. Rage and contagious fire caused these officers to abandon their training and resort to base instincts. Something they will regret for the rest of their lives. Sadly, those who could have stopped it, are free to allow it again—God Forbid.

Not yet finished with Kaufman's defense counsel Steve London, Perricone posted on September 21, 2011, at 6:26 a.m.:

.. and [London] **does a very poor job of pretending to be an attorney** .... **ask Kaufmann.**

And on November 5, 2011, at 8:23 a.m.:

**London doesn't know what day it is ... ask Archie Kaufman.** You must be with the NOPD.

Needless to say, such grandstanding comments emanating from then-Senior Litigation Counsel AUSA Perricone, especially those posted *during this trial,* were publicly available to those who were called as witnesses, or were to be called as witnesses in the future, including defense witnesses who had yet to testify, but may well have been monitoring media accounts of the trial, including those appearing on

nola.com and the accompanying flotsam set forth underneath in the form of "comments."

Contrary to the sophomoric antics described herein above, it must *always* be remembered that federal criminal prosecution of individuals is not a game; it is not a sport or some grand competition where "winning", above all else, is everything. Rather, it is a search for the truth, following irrefutable evidence and reasonable logical inferences drawn from such evidence, while maintaining the high standards of professionalism and ethics expected of all lawyers across the country. It must also be remembered, with irony, that Defendants in this very case are criminally accused by the United States government, *inter alia,* of falsifying stories and reports, omitting the truth, misrepresenting facts, and giving false statements to authorities, including the FBI. The very appearance of any attorney, acting on behalf of the United States of America, participating in such conduct should be dealt with promptly and harshly. The integrity of our criminal justice system requires as much.

A cavalier attitude toward the truth cannot be indulged at any juncture or level. The Court has, in the past, commented on the highly questionable credibility of certain witnesses at trial. (*See, e.g.,* Rec. Doc. 593, pp. 6–8 and Rec. Doc. 794, p. 17, n. 23, pp. 39–52). Questions and uncertainty likewise surrounded the testimony of another cooperating witness who entered a plea, Ignatius Hills, who had allegedly disavowed his guilt when speaking to his supervisor at the time of his resignation. (*See* July 28, 2011 testimony of NOPD Lieutenant Troy Savage, Rec. Doc. 691, at pp. 241–243.)[34] Moreover, the use

---

**34.** Additionally, Rakesha Barrios, the spouse of cooperating defendant Robert Barrios, initially claimed that her husband had been

forced to admit guilt and to cooperate despite the fact that he was innocent. (*See* July 25, 2011 testimony of Robert Barrios, Rec. Doc.

of drastically reduced statutory maximums for cooperating witnesses, versus the use of lengthy 18 U.S.C. § 924(c) mandatory statutory minimum sentences for those who chose to go to trial, raises serious concerns, as set forth in this Court's Order and Reasons dated April 11, 2012 (Rec. Doc. 794, pp. 38–52). In addition, the Court notes at least one instance of shockingly coercive tactics employed against one potential witness by FBI Special Agent William Bezak (*See, e.g.,* July 21, 2011 testimony of William Bezak, Rec. Doc. 674, at pp. 52–57). Further, at least three witnesses called by Defendants refused to appear at trial under threats from DOJ that they would be prosecuted for perjury as a result of their earlier grand jury testimony, and thus asserted their Fifth Amendment privilege so as to deprive defendants of live witnesses.[35] To the best of the Court's information, as of the date of this Order some sixteen months later, not one of these three defense witnesses has been charged with any crime.

In light of this backdrop, along with the still unknown extent to which AUSA Perricone, First AUSA Mann, and perhaps others, took liberties with knowledge possessed through positions of authority in the United States Attorney's Office, the Court believes further inquiry is warranted and that Defendants' motion, while still a longshot in terms of relief, can hardly be considered frivolous.[36] Given the seriousness of this alleged prosecutorial misconduct, along with the statutorily-mandated lengthy sentences imposed, the undersigned is unwilling to assume a "nothing to see here—move along now" attitude. The Court will not simply turn a blind eye toward such matters of consequence.

Indeed, as the undersigned stated in open court on June 13, 2012, there exists an institutional concern that representations to the Court, in pleadings and orally, are candid, based in fact, and beyond reproach, whether made by a witness or an attorney, whether in a civil or criminal case. The Court must have confidence that all legal processes were followed, including those regarding Federal Rule of Criminal Procedure 6(e) and orders sealing information not yet deemed to be public. Although the undersigned would reiterate that Defendants have a difficult order of proof, and relief under Rule 33

---

676, at pp. 157–165). On the stand, Robert Barrios denied such was the case. (*Id.* at pp. 164–65, 270–71, 275–76; July 27, 2011 testimony of Robert Barrios, Rec. Doc. 683, at pp. 25–30, 48–49).

**35.** Because of this, the Court allowed Defendants to present such testimony via reading a transcript; nonetheless, as is well-established, live testimony before a jury is always preferable and more convincing than reading from a cold transcript, as was done at this trial for these three witnesses. On July 27, 2011, as the defense commenced presenting its witnesses and evidence, the DOJ, through trial attorney Bernstein, advised the Court that two of the three witnesses "have both been informed that they are targets." With regard to one of these witnesses, Bernstein advised that the indictment was ready to be presented to the grand jury, but was held back so as to avoid pretrial publicity. As to the third, he stood orally accused of lying to a state grand jury, and thus declined to testify for the defendants at this trial.

**36.** In its opposition memorandum (Rec. Doc. 1007, pp. 12–14), the government refers to this Court's denial of the Defendants' pre-trial motion for change of venue (Rec. Doc. 397). Of course, in denying that motion, the Court was unaware that many of the prejudicial postings accompanying pre-trial publicity were made by senior litigation counsel in the U.S. Attorney's Office. This material fact would have considerably bolstered Defendants' arguments regarding change of venue. Because the Court seated a jury in this matter after extensive voir dire, the Court does not re-visit that decision in ruling on the current motion, but reserves Defendants' right to argue it later.

of the Federal Rules of Criminal Procedure might seem unlikely, it is not the province of the Court, nor its inclination, to simply short circuit the search for the truth by discounting a party's position, predicting a final outcome, and thus ruling with nothing more. The wiser procedure is to follow the evidence until such time as it satisfies the Court one way or the other—or until no further evidence can be generated that would shed further insight on matters of great concern.

 With regard to the Rule 6(e) issue presented in this matter, the Court has reviewed the Fifth Circuit's guidance set forth in *In re Grand Jury Investigation (Lance)*, 610 F.2d 202 (5th Cir.1980). In *Lance*, the Fifth Circuit discussed the analysis required when a district court considers an allegation of a violation of Rule 6(e) based upon news media reports. First, there must be a clear indication that the media reports disclose information about "matters occurring before the grand jury." Secondly, the article or articles must indicate the source of the information revealed to be one of those prescribed by Rule 6(e), which prohibits disclosure by attorneys for the government. Third, the Court must assume that all statements in such news report are correct. Fourth, the Court considers the nature of the relief requested and the extent to which it interferes with the grand jury process. Fifth, the Court must weigh any evidence presented by the government to rebut the assumed truthfulness of reports which otherwise make a *prima facie* case of misconduct.

 In this case, the Court finds that the first factor is satisfied, and the second factor has been met pursuant to *Lance*, which referred to the phrase "sources close to the investigation" to find an inference that the source of the information disclosed is the Justice Department, or the attorneys conducting the grand jury investigation, since they are the persons most likely to know when the presentation of evidence will be completed, and when a proposed indictment might be voted upon by the grand jurors. As to the third factor, the undersigned assumes that all statements in the news reports cited by defendants are correct. The fourth factor, which requires the Court to consider the nature of the relief requested and the extent to which it interferes with the grand jury process, is practically moot. In this case, the grand jury has completed its work and returned an indictment against these defendants (and those that entered guilty pleas to lesser charges), such that any relief granted herein would not interfere with the grand jury process at all. As to the fifth factor, the Court has not been provided with any affidavits or acceptable rebuttal evidence other than the tainted June 27, 2012 Report of Inquiry from former First AUSA Mann. The Report, however, does not contain sworn denials set forth in an affidavit, or any other testimonial refutations to contradict the *prima facie* case of misconduct. *See Lance*, 610 F.2d at 219–220.

Under these circumstances, the Court cannot rule on the defendants' motion for new trial until the DOJ rectifies the present inadequacies. Prosecutorial misconduct in this case is a very near and present thing; however, the possibility of it ripening into grounds for relief remain somewhat distant. At this juncture, the Court is unwilling to find that Defendants have met their burden; but it is also unwilling to find that Defendants will not be able to meet that burden. In the meantime, the Court intends to follow the advice of Washington himself: "There is but one straight course, and that is to seek truth and pursue it steadily."

## PART III: CONCLUSION

Considering the foregoing, **IT IS OR-DERED** that:

1. The Department of Justice shall recommence the investigation sought by the Court at the June 13, 2012 hearing, and as originally submitted by former First AUSA Mann on June 27, 2012. The new report shall be in compliance with the guidance set forth in *In re: Grand Jury Investigation (Lance)*, 610 F.2d at 219–220 (5th Cir.1980), and shall be submitted to chambers within thirty (30) days of the date of this Order. In accomplishing this task, the government shall inquire of the recipients of information regarding the plea of cooperating defendant Michael Lohman the identity(ies) of the source(s) of such information; and should the government elect not to so question those recipients, it shall state in writing, on the record, the reason for its failure or unwillingness to do so.

2. The Department of Justice shall recommence compliance with this Court's Order of July 9, 2012 (Rec. Doc. 1034). The government shall submit its response in chambers for *ex parte* review within thirty (30) days of the date of this Order.

3. A copy of this Order be transmitted to the Louisiana Attorney Disciplinary Board of the Louisiana State Bar Association ("LSBA") for further investigation of the activities of former AUSA Perricone and AUSA Jan Mann and, if warranted, disciplinary action.

4. A copy of this Order be transmitted to the EDLA Lawyers Disciplinary Enforcement Committee for further investigation of the activities of former AUSA Perricone and AUSA Jan Mann and, if warranted, disciplinary action.

5. In light of the information provided herein, the following record documents be and are hereby **UNSEALED:** 1034, 1056, 1061, 1063, 1065, 1066, and 1068. To the extent the contents of other sealed documents are revealed herein, those excerpts are unsealed, but in all other respects, the documents remain sealed and/or subject to any previously entered protective order.

6. All counsel shall be notified of the next status conference/hearing in this case upon completion and submission of numbers 1 and 2 herein above.